**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| MANTEG LUTHRA, derivatively on behalf of CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, | Case No. _____ |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| VIVEK GARIPALLI, JOSEPH WAGNER, ANDREW TOY, NATHANIEL S. TURNER, LEE SHAPIRO, CHAMATH PALIHAPITIYA, STEVEN TRIEU, IAN OSBORNE, JACQUELINE D. RESES, JAMES RYANS, | |
| Defendants, | |
| and | |
| CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Manteg Luthra ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

on behalf of Nominal Defendant Clover Health Investments, Corp. ("Clover" or the "Company")

f/k/a Social Capital Hedosophia Holdings Corp. III ("SCH"),[1] files this Verified Shareholder

Derivative Complaint against Individual Defendants Vivek Garipalli, Joseph Wagner, Andrew

---

[1] Clover Health Investments, Corp. is referred to interchangeably as the Company, Clover, and SCH herein.

– 1 –

Toy, Nathaniel S. Turner (collectively, the "Clover Health Defendants"), and Lee Shapiro; and against Chamath Palihapitiya, Steven Trieu, Ian Osborne, Jacqueline D. Reses, and James Ryans, (collectively, the "SCH Defendants," together with the Clover Health Defendants, the "Individual Defendants;" the Individual Defendants together with Clover the "Defendants"), for breaches of their fiduciary duties and/or violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against the Clover Health Defendants for aiding and abetting the SCH Defendants' breaches of their fiduciary duties as directors and/or officers of SCH. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Clover, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Clover's directors and officers from October 6, 2020 through February 4, 2021, including both dates (the "Relevant Period").

2. Clover, based in Franklin, Tennessee, claims to be a next-generation Medicare Advantage insurer which utilizes the Clover Assistant—the Company's software platform—to

- 2 -

provide senior citizens with affordable Preferred Provider Organization ("PPO") and Health Maintenance Organization ("HMO") health insurance plans with wide network access and equal cost-sharing for in- and out-of-network providers.

3.      In October 2020, Clover Health (defined below) began to process of becoming a publicly-traded company by merging with special purpose acquisition company, SCH. Before the January 7, 2021 reverse merger with SCH, the Company functioned as a private company with the same name ("Clover Health") (the "Merger"). Clover Health was founded in 2014; SCH's common stock began publicly trading on the New York Stock Exchange ("NYSE") in June 2020 under the ticker symbol "IPOC." After the Merger, Clover's common stock began publicly trading on The Nasdaq Stock Market LLC ("NASDAQ") under a new ticker symbol, "CLOV."

4.      In anticipation of the Merger, the SCH Defendants filed numerous documents with the SEC (the "Merger Filings," defined further below) which touted the functionality of the Company's software and characterized the Clover Assistant as "delight[ful]" for healthcare providers to use. These Merger Filings further assured investors that the Company was not subject to any legal proceeding that might have a material adverse effect on Clover's business, operating results, cash flows or financial condition and that the Company maintained effective internal controls designed and implemented to prevent violations of applicable law.

5.      After the Merger closed, on January 13, 2021, the Company filed a registration statement on Form S-1 with the SEC (the "SPO Registration Statement") in connection with a secondary public offering and the resale of, *inter alia*, shares of Class A Clover common stock and warrants to purchase shares of Class A Clover common stock, by "Selling Securityholders," which included Defendants Garipalli, Palihapitiya, Wagner, Toy, Osborne, Reses, Ryans, and Turner.

- 3 -

The SPO Registration Statement, together with a prospectus filed on January 29, 2021 with the SEC pursuant to Rule 424(b)(3) (the "SPO Prospectus," together with the SPO Registration Statement, the "SPO Offering Documents") made many of the same representations as the Merger Filings regarding regulatory and legal proceedings as well as the Clover Assistant.

6. These statements, together with other statements made publicly by or on behalf of the Company throughout the Relevant Period, omitted certain material facts. Among these omitted material facts was that the U.S. Department of Justice ("DOJ") had commenced an investigation into certain misconduct and had issued a Civil Investigative Demand to Clover. The DOJ investigation sought to determine whether the Clover Health Defendants had engaged in and/or permitted and caused the Company to engage in kickbacks, improper marketing practices, and undisclosed related party transactions both preceding and throughout the Relevant Period.

7. On February 4, 2021, *Hindenburg Research* revealed the truth when it published a report (the "Hindenburg Report") detailing that Clover was the subject of a DOJ investigation and that preceding and throughout the Relevant Period, the Clover Health Defendants caused Clover Health and the Company to, *inter alia*: (1) violate federal antikickback laws and Medicare Communications and Marketing's Guidelines by making improper payments to healthcare provides and their staff; (2) develop and deploy software to assist in the scheme to defraud the federal government through overbilling; (3) engage in and/or permit misleading marketing practices to deceive senior citizens into buying healthcare plans offered by Company; and (4) participate in related party transactions which went unreported with a marketing company that landed a majority of the Company's sales (collectively, the "Misleading Sales Practices").

- 4 -

8.	Following this revelation, the Company's share price fell $1.72, or about 12.3%, from its closing price of $13.95 per share on February 3, 2021, to close February 4, 2021 at $12.23 per share. The Company's warrant price fell $0.18, or about 5%, from its closing price of $3.57 per warrant on February 3, 2021, to close February 4, 2021 at $3.39 per warrant.

9.	The next day, February 5, 2021, before market open, Clover announced that the SEC was also investigating and that it had requested document and data preservation for the period from January 1, 2020 to the present, concerning the Misleading Sales Practices and other issues described in the Hindenburg Report.

10.	Following this announcement, the Company's share price fell $0.53, or about 4.3%, in intraday trading on February 5, 2021. The Company's warrant price fell $0.28 per warrant, or about 8.2%, in intraday trading on February 5, 2021.

11.	During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact to the investing public that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Misleading Sales Practices; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed a severe risk to the Company given the amount revenue of it received from Medicare; (3) a meaningful portion of Clover's and Clover Health's sales were attributable to unreported related party transactions; (4) Clover's subsidiary, Seek Insurance Services, Inc. ("Seek Insurance"), misleadingly marketed to senior citizens; (5) the Clover Assistant software was faulty and unsophisticated; and (6) the

- 5 -

Company failed to maintain internal controls. As a result, the Company's public statements were materially false and misleading throughout the Relevant Period.

12. The Individual Defendants further breached their fiduciary duties by failing to correct, and/or causing the Company to fail to correct, these false and misleading statements and omissions of material fact to the investing public.

13. In breach of their fiduciary duties, the Clover Health Defendants engaged in, permitted, and caused the Company to engage in the Misleading Sales Practices.

14. Moreover, the Individual Defendants also breached their fiduciary duties during the Relevant Period by causing the Company to fail to maintain internal controls.

15. Throughout the Relevant Period, numerous Clover Health and SCH joint press releases and SEC filings failed to disclose the existence of the Misleading Sales Practices. This was a serious error which rendered the press releases unreliable. Moreover, Clover Health's and SCH's SEC filings issued throughout the Relevant Period stated that Clover maintained adequate control over its financial reporting, which was not true at the time such filings were made.

16. As a result of the Individual Defendants' misconduct, which has led to Clover, as well as the Company's Chief Executive Officer ("CEO"), being named as defendants in three federal securities fraud class action lawsuits pending in the United States District Court for the Middle District of Tennessee (the "Securities Class Actions"), SCH's former CEO and Company advisor, Clover's Chief Financial Officer ("CFO"), and its Chief Technology Officer ("CTO") to being named as defendants in two of the three Securities Class Actions, and SCH's former CFO, former President, and two former directors as defendants in one of the three Securities Class Actions, the need to undertake internal investigations, the need to implement adequate internal

- 6 -

controls over its financial reporting, the losses due to the Individual Defendants being improperly over-compensated by the Company in light of their breaches of fiduciary duty and/or who benefitted from the wrongdoing alleged herein, the Company has had to and will have to expend many millions of dollars.

17. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct, and the aiding and abetting thereof.

18. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and President and CTO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Clover's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

- 7 -

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because Clover is headquartered in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Clover common stock. Plaintiff has continuously held Clover common stock at all relevant times.

### Nominal Defendant Clover

24.     Nominal Defendant Clover is a Delaware corporation with principal executive offices at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067. Clover's common stock trades on the NASDAQ under the ticker symbol "CLOV." Clover's warrants, redeemable to for one share of Clover Class A common stock, trade on the NASDAQ under the ticker symbol "CLOVW."

25.     Preceding the Merger, Clover's stock, units, and warrants traded on the NYSE under the ticker symbols "IPOC," "IPOC.U," and "IPOC.WS," respectively.

### Defendant Garipalli

26.     Defendant Vivek Garipalli ("Garipalli") is the co-founder of Clover Health and has been Clover's CEO as and a Company director since the January 2021 Merger. He is also a member of the Audit Committee. Preceding the Merger, Defendant Garipalli served as Clover Health's President from July 2014 to March 2019.

- 8 -

**Defendant Wagner**

27.     Defendant Joseph Wagner ("Wagner") has served as Clover's CFO since the January 2021 Merger. Preceding the Merger, he held the same position with Clover Health from January 2020 until the Merger.

**Defendant Toy**

28.     Defendant Andrew Toy ("Toy") has been Clover's President, CTO, and a Company director since the Merger in January 2021. Previously, he held those same positions with Clover Health from March 2019, February 2018, and November 2018, respectively, until the Merger.

29.     For the fiscal year ended December 31, 2020, Defendant Toy received $8,617,885 in compensation from the Company, including $415,385 in salary, $8,190,695 in option awards, and $11,805 in all other compensation.

**Defendant Turner**

30.     Defendant Nathaniel S. Turner ("Turner") has been a Company director since the January 2021 Merger. He is a member of the Audit Committee and a member of the Talent and Compensation Committee. Previously, he was a Clover Health director from April 2015 until the Merger.

31.     For the fiscal year ending December 31, 2021, Defendant Turner is entitled to at least $50,000 as a Company director and an additional $10,000 as a member of the Audit Committee. Defendant Turner is also entitled to at least a grant of restricted stock units valued at $400,000 multiplied by the anticipated number of whole months from the closing of the Merger until the Company's 2022 annual meeting divided by 24.

**Defendant Shapiro**

- 9 -

32. Defendant Lee Shapiro ("Shapiro") has been a Company director since the January 2021 Merger. He is the Chair of the Audit Committee and the Chair of the Nominating and Corporate Governance Committee.

33. For the fiscal year ending December 31, 2021, Defendant Shapiro is entitled to at least $50,000 as a Company director, an additional $25,000 as Chair of the Audit Committee, and an additional $15,000 as Chair of the Nominating and Corporate Governance Committee. Moreover, Defendant Shapiro is entitled to at least a grant of restricted stock units valued at $400,000.

**Defendant Palihapitiya**

34. Defendant Chamath Palihapitiya ("Palihapitiya") was SCH's CEO and Chairman of the Board from October 2019 until the January 2021 Merger. After the Merger, Defendant Palihapitiya has been a senior advisor to Clover's management.

**Defendant Trieu**

35. Defendant Steven Trieu ("Trieu") was SCH's CFO from January 2020 until the January 2021 Merger.

**Defendant Osborne**

36. Defendant Ian Osborne ("Osborne") was SCH's President from January 2020 and a Company director from October 2019 until the January 2021 Merger.

**Defendant Reses**

37. Defendant Jacqueline D. Reses ("Reses") was a director of SCH from April 2020 until the January 2021 Merger.

**Defendant Ryans**

- 10 -

38.     Defendant James Ryans ("Ryans") was a director of SCH from 2020 until the January 2021 Merger. He was the Chair of the Company's Audit Committee from 2020 until the Merger.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

39.     Clover, based in Franklin, Tennessee, sells Medicare insurance plans to senior citizens and provides physicians with software—the Clover Assistant—intended to aggregate data on patients in the Clover network. The Company states that its highest membership growth rate is Medicare Advantage plan customers in the United States, with more than 50,000 members. Since 2012 when Clover Health was operating as a private company, the Company has incurred significant annual net losses and accumulated a deficit of about $901.6 million as of September 30, 2020.

40.     SCH was incorporated in the Cayman Islands in October 2019 as a special purpose acquisition company. SCH was formed for the purpose of effecting business combination with other businesses. On April 24, 2020, SCH went public after its initial public offering ("IPO"). SCH raised $720 million after pricing 72 million units at $10 each in its IPO. Each unit consisted of one share of Class A common stock and one-third of one redeemable warrant. A warrant entitled the holder to purchase one share of Class A common stock at an exercise price of $11.50 per share. After increasing the size of the IPO, SCH issued 82.8 million shares of its Class A common stock.

41.     Before the Merger, Clover Health was a San Francisco–based company that was cofounded by Defendant Garipalli in 2012. Defendant Garipalli had experience in this area having

- 11 -

founded CarePoint Health System ("CarePoint"), a for-profit, privately-held healthcare system that operated at least three hospitals in New Jersey.

42.     CarePoint had a reputation for charging excessive rates and one of its hospitals had the highest billing rates in the country. CarePoint settled a probe by the New Jersey Medicaid Fraud Division for $1 million following an investigation into overpayment concerning billing claims lacking adequate documentation. According to a March 2019 report released by the New Jersey Commission of Investigations, Defendant Garipalli and others managed to extract over $157 million from CarePoint through management fees and allocations paid by CarePoint hospitals to related parties.

### The Merger and Secondary Public Offering

43.     SCH's management team began holding weekly meetings, starting in May 2020, regarding SCH's initial business combination. SCH entered into discussions in June 2020 with Clover Health relating to a proposed business combination before issuing a joint press release announcing that they had entered into a merger agreement in October 2020. Upon the Merger's closing, SCH reincorporated as a Delaware company and renamed itself Clover.

44.     On October 6, 2020, the Company filed a current report on Form 8-K announcing that it had entered into an Agreement and Plan of Merger (the "Merger Plan"). On October 20, 2020, the Company filed the a registration statement with the SEC on Form S-4 (the "Registration Statement"). On November 20, 2020, December 9, 2020, and December 10, 2020, the Company filed amendments to the Registration Statement on Form S-4/A with the SEC. The Registration Statement, as amended, was declared effective on December 11, 2020.

- 12 -

45.     On December 14, 2020, the Company filed with the SEC a prospectus and proxy statement on Form 424B3 (the "Prospectus") and Form DEFM14A (the "2020 Proxy Statement," together with the Registration Statement and the Prospectus, the "Merger Filings"). The Company's stock began trading publicly on the NASDAQ under its new ticker symbol, "CLOV" on January 8, 2021.

46.     On January 13, 2021, the Company filed the SPO Registration Statement. The SPO Registration Statement was declared effective on January 27, 2021. Then, on January 29, 2021, the Company filed the SPO Prospectus.

**The Misleading Sales Practices**

47.     Both before and throughout the Relevant Period, the Clover Health Defendants allowed multiple violations of applicable laws. These violations included, but were not limited to, engaging in or permitting the Misleading Sales Practices. As a result, the Clover Health Defendants caused the Company, and enabled the SCH Defendants, to engage in the Misleading Sales Practices by failing, and allowing the Company to fail, to take meaningful action in response to these violations and to take wrongful action in response. The Misleading Sales Practices resulted in adverse news reports, including the Hindenburg Report; costly litigation, including the Securities Class Actions; costly investigations commenced by the DOJ and SEC; and consequently, a decline in the value of the Company.

*Hidden Payments to Healthcare Providers*

48.     As described in the Hindenburg Report, Clover and Clover Health paid healthcare providers $200 per visit if they used Clover Assistant platform in order for the Company and

- 13 -

Clover Health to "upcode," or increase diagnosis codes thus characterizing patient as sicker than they were, to maximize government reimbursement payments.

49.     Former employees of Clover and Clover Health came forward to reveal that Clover and Clover Health were making these illegal payments to generate patient leads. The Company and Clover Health would distribute untraceable gift cards to healthcare providers to get them to direct patients to Clover and Clover Health healthcare plans. Clover's and Clover Health's gift card distribution were in violation of Medicare Communications and Marketing's Guidelines, which explicitly prohibit a provider from "urg[ing]" or "attempt[ing] to persuade" patients to enroll in specific Medicare Advantage plans due to "financial" or "any other interests" of the provider.

50.     Clover and Clover Health, as further described in the Hindenburg Report, also made illegal payments to healthcare provider staff, like front-desk employees, for referrals to patients to promote the Company's and Clover Health's healthcare plans to senior citizens.

### *Illegal Overbilling Fraud*

51.     The Company and Clover Health also used the Medicare Advantage payment model to illegally overbill. Clover's and Clover Health's software was designed so that it could upcode patients so that Clover and Clover Heal could receive higher payment rates. This exploited the Centers for Medicare & Medicaid Services' ("CMS") practice of increasing payments for patients with higher "risk assessment" scores.

52.     A former employee stated that the "core feature" of the Clover Assistant platform was to "increase revenue by identifying chronic conditions that people have and CMS will pay[.]"

53.     The Hindenburg Report stated that the Clover Assistant also "recaptures" old and diagnoses and makes it "difficult" for doctors to remove them. Numerous doctors found that the

diagnoses in Clover's and Clover Health's system were inaccurate because the software "limits their ability to remove an inapplicable diagnosis." One doctor told *Hindenburg Research:* "Your patients don't necessarily fit into one of their boxes, but you have to click a box to get to the next screen."

### *Deceptive Marketing*

54. During the Relevant Period, Clover's wholly owned subsidiary, Seek Insurance deceived consumers while failing to disclose its connection to Clover. Even currently, Seek Insurance's website holds itself out as an "independent" and "unbiased" source of information. In fact, the website specifically states that it is "privately owned and operated by Seek Insurance Services, Inc." but does not disclose that Seek Insurance is itself owned by Clover. To the contrary, Seek Insurance deceptively markets to senior citizens that it is "ready to help you compare your options and find the best Medicare plan – no matter which insurance company offers it." Notwithstanding its ownership by Clover, Seek Insurance even stated that "[w]e don't work for insurance companies. We work for you."

55. Seek Insurance's website contains a blog post criticizing other insurance brokers as "incentivized to steer clients towards a plan that is tied to their own financial interest," the exact circumstance Seek Insurance operates in, while characterizing itself as "neutral" and its approach as "impartial" before it implores consumers to "trust" them to be "objective[.]"

### *Related Party Transactions*

56. A substantial portion of the Company's and its predecessor's sales were and remain attributable to an undisclosed relationship the Company has with insurance brokerage firm, B & H Assurance, LLC ("B&H"), controlled by the Company's Head of Sales, Hiram Bermudez

- 15 -

("Bermudez"). Bermudez purportedly left B&H where he was VP of Sales Operations in September 2012, but he is still listed as B&H's sole agent according to the most recent New Jersey corporate records.

57.     One former employee described how Bermudez never left B&H. Instead, Clover Health utilized his field marketing organization— designed to negotiate sales deals with insurers that a network of brokers can then offer and sell to customers—to grow its sales. Another former employee that *Hindenburg Research* interviewed stated that Bermudez took steps to actively conceal the relationship by "hand[ing] his business over to" his wife.

58.     Although B&H describes Clover as a partner on its website, it does not list Clover under its formal relationship disclosures with the National Association of Insurance Commissioners ("NAIC"). NAIC records indicate that the only business entity affiliation listed for B&H is with Yesenia Rivera—Bermudez's wife.

### *Investigations*

59.     As was first described in the Hindenburg Report and as the Company later admitted in a February 5, 2021 *Medium* article, Clover is the subject of an DOJ investigation due to the Misleading Sales Practices. The Hindenburg Report also stated that the DOJ had issued a Civil Investigative Demand to Clover.

60.     On February 5, 2021, the Company filed a current report on Form 8-K with the SEC which revealed that Clover had also received a letter from the SEC. This letter indicated that the SEC had commenced an investigation into the Misleading Sales Practices and requested that the Company preserve documents and data for the period from January 1, 2020 to the present.

- 16 -

**The Duty to Disclose**

61.     SEC Regulation S-K imposes affirmative disclosure requirements on public companies with respect to their finances and operations. Item 303 of Regulation S-K requires that registration statements filed either on S-1 or S-4 filed with the SEC include a "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section. Item 303(a)(3)(ii) provides that the MD&A section must:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

62.     Item 503 of Regulation S-K required the Individual Defendants to include in the "Risk Factors" section of the Merger Filings "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

63.     Therefore, the Individual Defendants had a duty, pursuant to Regulation S-K, to disclose the Misleading Sales Practices and the DOJ investigation because these facts constituted: (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in Clover speculative or risky.

**False and Misleading Statements**

***October 6, 2020 Press Release, CNBC Interview, and Form 425 Prospectus***

64.     On October 6, 2020, Clover Health and SCH issued a joint press release announcing a reverse merger at a $3.7 billion valuation. The press release characterized Clover as "a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses" with a "unique model in health insurance," that "partners with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care."

65.     Describing the Merger, Clover Health's business, and the Clover Assistant, the press release stated:

• Clover is a next-generation Medicare Advantage insurance company offering **best-in-class plans** that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses

• A unique model in health insurance, Clover partners with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care

• The transaction is expected to fuel Clover's trajectory as one of the nation's fastest growing Medicare Advantage plans

• Transaction values Clover at an enterprise value of $3.7 billion and is expected to provide up to $1.2 billion in cash proceeds, including a fully committed PIPE of $400 million and up to $828 million of cash held in the trust account of Social Capital Hedosophia Holdings Corp. III ("SCH")

• PIPE led by $100 million from Chamath Palihapitiya, Founder and CEO of SCH, and $50 million from Hedosophia, as well as commitments from Fidelity Management & Research Company, LLC., and funds affiliated with Jennison, Senator Investment Group LP, Casdin and Perceptive Advisors

• Clover is expected to receive up to $728 million of transaction proceeds, and up to $500 million of cash proceeds is expected to be allocated to existing Clover shareholders

. . . Clover Health Investments, Corp. ("Clover" or "the Company"), which operates next-generation Medicare Advantage plans, has entered into a definitive agreement to become publicly traded via a merger with Social Capital Hedosophia Holdings

- 18 -

Corp. III ("SCH")(NYSE: IPOC), a special purpose acquisition company. Upon closing, the transaction will support Clover's **mission to improve every life**, providing significant capital for the Company to scale and improve health outcomes for seniors across the United States.

(Emphasis added.)

66.     The press release continued:

**Company Overview**

Founded in 2013, Clover has pioneered a fundamentally different approach to Medicare Advantage **that focuses on driving affordability** and partnering closely with physicians to deliver the **best possible health outcomes** for members. The Company offers affordable Medicare Advantage plans to eligible individuals, giving consumers access to broad and open healthcare networks, rich supplemental benefits and low out-of-pocket expenses.

(Emphasis added.)

67.     The press release also described Clover Assistant and the purported benefits Clover

Health's technology provides:

> **Technology is at the core of Clover's business – the Company is a true innovator in the Medicare Advantage space, deploying its own internally-developed software to assist physicians with clinical decision-making at the point of care**.
>
> Clover's flagship platform, the Clover Assistant, aggregates millions of relevant health data points – including claims, medical charts and diagnostics, among others – and uses machine learning to synthesize that data with member-specific information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes.
>
> The Clover Assistant enables a **virtuous growth cycle**, whereby improved health outcomes lead to superior economics that the Company shares with members through lower costs and rich benefits. In turn, the Company believes its **best-in-class** plans will continue to deliver market-leading growth, allowing the Clover Assistant to capture and synthesize more data and **ultimately drive better care**.
>
> Medicare Advantage is one of the largest and fastest growing markets in the U.S. healthcare system – but it is one that has seen little innovation and remains ripe for disruption. Worth $270 billion today and with an estimated value of $590 billion

- 19 -

by 2025, the Medicare Advantage market provides a tremendous opportunity for growth.

Today, Clover is the fastest growing Medicare Advantage insurer in the United States – among insurers with more than 50,000 members – and serves more than 57,000 members in 34 counties across 7 states. ***Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach***, Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables ***efficient expansion into new markets***, including to historically underserved and rural communities. The Company plans to expand into an additional 74 counties and eighth state next year and recently announced a new partnership with Walmart to make joint Clover-Walmart plans available to half a million Medicare-eligibles in eight Georgia counties.

Clover's management team, led by CEO and Co-Founder Vivek Garipalli and President and Co-Founder Andrew Toy, will continue to lead Clover following the transaction. Chamath Palihapitiya, Founder and CEO of SCH, will act as a senior advisor to the Company's management.

(Emphasis added.)

68.     Moreover, Defendants Garipalli, Toy, and Palihapitiya were quoted promoting

Clover Health's many supposed strenghts. The press release stated the following, in relevant part:

**Management Comments**
"I launched Clover eight years ago ***to fix fundamental flaws in our healthcare system***, including unequal access, abysmal customer service and wasteful spending. Chamath and the SCH team are fervent believers and true champions of Clover's ***mission to improve every life***," said Garipalli. "***Our philosophy is that everyone should be able to afford great healthcare***. The Clover team empowers physicians to deliver the ***best possible outcomes*** for our members, and ***the Clover Assistant does just that*** by delivering vital clinical insights to physicians at the point of care."

"***We have made it our business to make healthcare affordable***. Our technology helps doctors, ***leading to better outcomes*** and lower out-of-pocket expenses for members," said Toy. "***I believe that more and more doctors are embracing the Clover Assistant because it allows them to focus on what they want to do, which is to look after patients***. Importantly, the platform is powered by a closed feedback loop, linking clinical data and physician action, which improves continuously as membership grows, allowing us to constantly evolve new ways of helping physicians and their patients."

- 20 -

Palihapitiya said, "***We need companies like Clover to help fix our broken healthcare system. The Company's rapid growth is a testament to the effectiveness of its tech-enabled approach***, which resonates powerfully with consumers and physicians alike. I believe Clover is uniquely positioned to disrupt the entire Medicare Advantage market as well as expand into new and exciting opportunities in Original Medicare. I am proud to partner with Vivek, Andrew and the entire Clover team on the next phase of their mission to improve lives across the country."

(Emphasis added.)

69. On *CNBC*'s "Squawk Box" that same day, October 6, 2020, Defendant Palihapitiya described Clover Health's "transparency," stating that the Company "create[s] transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid."

70. Also on October 6, 2020, Clover Health and SCH, filed a prospectus with the SEC on Form 425 which attached the Merger Plan as an exhibit. The Merger Plan, signed by Defendants Garipalli and Palihapitiya, stated under "Healthcare Compliance": "[e]ach of [Clover] and its Subsidiaries (i) in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws, including all Health Care Laws, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program[.]" "Health Care Laws," is defined within the Merger Plan to include the Federal False Claims Act, the Federal Anti-Kickback Law, and other related laws.

71. The Merger Plan also stated that, "[s]ince January 1, 2018 … (iii) each of [Clover] and its Subsidiaries has implemented and maintained a compliance program, including policies, procedures and training, intended to ensure compliance with all applicable Health Care Laws…"

***October 20, 2020 Registration Statement***

- 21 -

72. On October 20, 2020, Clover filed the Registration Statement with the SEC. Defendants Palihapitiya, Trieu, Osborne, Reses, and Ryans signed or authorized the signing of the Registration Statement. The Registration Statement asserted that Clover Health, in preparation for the Merger, held discussions with SCH regarding "typical due diligence" and that between August 25 and August 28, 2020, the two companies with the assistance of legal counsel, "held a meeting via video teleconference to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of Clover's business." The Registration Statement further stated that on August 27, 2020, SCH's legal counsel was "provided with access to a virtual data room of Clover and began conducting a preliminary legal due diligence review of Clover" and that several other discussions regarding due diligence in connection to the Merger had occured

73. The Registration Statement, regarding the results of SCH's due diligence, stated:

The SCH board of directors considered the scope of the due diligence conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to Clover, including: (a) extensive virtual meetings and calls with Clover's management team regarding its operations, projections and the proposed transaction; and (b) review of materials related to Clover and its business, made available by Clover, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, healthcare matters and other regulatory and compliance matters and other legal and business diligence.

74. The Registration Statement also stated the following of Clover Health's business:

At Clover Health, we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next-generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers. We call our plans "Obvious" because we believe they are highly affordable – offering most of

- 22 -

our members the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets – and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data-driven, personalized insights at the point of care through our software platform, we believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale, through an asset-light approach. Today, we have the highest membership growth rate among Medicare Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. We believe our growth potential in existing and future markets is high.

*      *      *

We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

*      *      *

As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to members through our "Obvious" plans. We strive to continuously lower our members' out-of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits. . . .

75.     The Registration Statement had this to say of Clover Health's growth:

We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious"

- 23 -

plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.

*     *     *

As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period. Established market take rate is derived from publicly available CMS data and represents the number of members gained by an insurer as a percentage of the total number of incremental MA members added to comparable plans in established markets. This rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5 million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended September 30, 2019, in each case, representing a 46% increase. During 2018 and 2019, we also built the infrastructure to deliver on a more efficient healthcare experience for our members, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1)% and (38.3)%, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2)%. Our improved results in the current year were the result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19.

*     *     *

We've already seen a glimpse of what's possible. Clover currently offers Medicare Advantage plans in 7 states and 34 markets. Our "obvious" plans are among the most affordable in their markets. They generally offer the widest physician networks. As a result, they benefit from industry-leading organic growth, with a 38% annual growth rate compared to an 8% industry average.

76.     On the topic of the "Clover Assistant," the Registration Statement relayed that:

- 24 -

The Clover Assistant delights and engages physicians. We are focused on empowering and delighting physicians that use our platform. Physicians are highly satisfied with the Clover Assistant platform, as evidenced by our platform's positive NPS of 64 for the three months ended June 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic and NextGen. Onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

77. The Registration Statement also touted the "best-in-class" healthcare plans of

Clover Health by stating:

The SCH board of directors believes that Clover provides a fundamentally different approach to insurance, offering highly affordable, best-in-class plans that combine wide access to healthcare and supplemental benefits with low out-of-pocket expenses. Clover designs its plans to provide the access of a PPO at lower than HMO costs. Most of its members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with wide network access and with the same in-and out-of-network costs for physician visits. For example, based on a company analysis that assumes a lifetime of seven years on Medicare, Clover estimates that its highest enrolled plan offers a 17% average lifetime cost savings compared to the highest enrolled MA competitor plan in Clover's five largest markets. Likewise, based on a similar company analysis, Clover estimates that its highest enrolled plan offers a 41% average lifetime cost savings compared to Original Medicare, taking into account the Kaiser Family Foundation's reported average Original Medicare enrollee's out-of-pocket spending on medical and long-term care services in 2016. The SCH board of directors believes that Clover's best-in-class plans will continue to deliver market-leading growth, allowing Clover Assistant to capture and synthesize more data and ultimately drive better care.

78. In the "Government Regulation" section, the Registration Statement stated: "We

work diligently to ensure compliance with all applicable laws and regulations." The Registration

Statement continued:

Our operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and

- 25 -

enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.

79. Under "Legal Proceedings," the Registration Statement maintained that the Company was "not presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

80. With regard to "Litigation and Proceedings," the Merger Plan, attached to the Registration Statement, stated:

Section 4.10. Litigation and Proceedings. Except as set forth on Section 4.10 of the Company Disclosure Letter, as of the date hereof, (a) there are no pending or, to the knowledge of the Company, threatened, lawsuits, actions, suits, judgments, claims, proceedings or any other Actions (including any investigations or inquiries initiated, pending or threatened) by any Governmental Authority, or other proceedings at law or in equity (collectively, "Legal Proceedings"), against the Company or any of the Company's Subsidiaries or their respective properties or assets; and (b) there is no outstanding Governmental Order imposed upon the Company or any of the Company's Subsidiaries; nor are any properties or assets of the Company or any of the Company's Subsidiaries' respective businesses bound or subject to any Governmental Order, except in the case of each of clauses (a) and (b), as would not be, or would not reasonably be expected to be, material to the business of the Company and its Subsidiaries, taken as a whole.

81. The Merger Plan, a part of and attached to the Registration Statement as Annex A, further stated that the disclosure letters referenced above "are not publicly filed," and that the Company "did not believe that the disclosure letters contain information that is material to an investment decision."

82. With regard to "Legal Compliance" in connection to Clover Health (referred to therein as "the Company,") the Merger Plan stated:

Section 4.11. Legal Compliance.

(a) Each of the Company and its Subsidiaries is, and for the prior five (5) years has been, in compliance in all material respects with applicable Law.

(b) The Company and its Subsidiaries maintain a program of policies, procedures, and internal controls reasonably designed and implemented to (i) prevent the use of the products and services of the Company and its Subsidiaries in a manner that violates applicable Law (including money laundering or fraud), and (ii) otherwise provide reasonable assurance that violations of applicable Law by any of the Company's or its Subsidiaries' directors, officers, employees or its or their respective agents, representatives or other Persons, acting on behalf of the Company or any of the Company's Subsidiaries, will be prevented, detected and deterred.

(c) Neither the Company nor any of its Subsidiaries or any of the officers, directors or employees thereof acting in such capacity has received any written notice of, or been charged with, the violation of any Laws, except where such violation has not been, individually or in the aggregate, material to the Company and its Subsidiaries.

83.    Under "Risk Factors," the Registration Statement described Clover's risk of

litigation as follows:

> From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and

- 27 -

supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

84. The "Risk Factors" section of the Registration Statement also stated, concerning

the threat of government scrutiny and litigation and specifically with regard to anti-kickbacks, that:

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "Risk factors— Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

\*     \*     \*

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and

- 28 -

regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

85.     The "Risk Factors" section of the Registration Statement continued by addressing

potential government scrutiny and litigation related to the submission of false claims:

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the

- 29 -

lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

86.     About the Company's "Sales and Marketing," the Registration Statement stated:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

87.     The Registration Statement described the Company's "risk adjustment model" as

follows:

When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer-oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

***November 19, 2020 Presentation***

- 30 -

88.     On November 19, 2020, the Company filed a current report on Form 8-K which contained as an exhibit an analyst presentation titled, "Clover Health A Deeper Dive." The presentation highlighted Clover Health's "Virtuous Growth Cycle" and emphasized: "Physicians value the Clover Assistant." The presentation further maintained that "[i]n ~2 years since product launch, we've built a broad base of engaged physicians. Given our software-driven approach, we believe we can scale these results rapidly within existing and new markets." The presentation continued that physicians were "[i]ncentivized to use [Clover's] highly delightful tech platform . . . that suggests personalized care recommendations at the point of care" and that the Clover Assistant was "[d]esigned to work with any PCP and remove financial concerns from clinical decision-making."

### December 14, 2020 Proxy Statement

89.     On December 14, 2020, the Company filed the 2020 Proxy Statement to solicit shareholder approval of the Merger. Defendants Palihapitiya, Osborne, Reses, and Ryans solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act. The 2020 Proxy Statement contained material misstatements and omissions.[2]

90.     The 2020 Proxy Statement called for shareholder approval of, *inter alia*: (1) the Merger; (2) the election of five directors, including Defendants Garipalli, Toy, Turner, and Shapiro, and non-party Chelsea Clinton ("Clinton"); and (3) the issuance of Clover Class A or Class B common stock pursuant to the Merger Plan; (4) the 2020 Equity Incentive Plan, which

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

- 31 -

provided that Class A common stock shares of up to 5.5% of the total outstanding capital stock of the Company could be issued, in amounts increasing each fiscal year beginning with 2022, to attract and retain personnel and incentivize employees, directors, and contractors and align their interest with shareholders; (5) the 2020 Management Incentive Plan, which allowed for Class B common stock shares of up to 6% of the total outstanding common stock of the Company to be issued to award Defendants Garipalli and Toy to enhance the Company's ability to incentivize them and promote success of the Company's business; and (6) the 2020 Employee Stock Purchase Plan, which allowed for Class A common stock shares of up to 0.5% of the total outstanding capital stock of the Company to be issued to grant a series of purchase rights to eligible employees and service providers to incentivize and retain employees and service providers (collectively, the "Proposals").

91.     The 2020 Proxy Statement stated that Clover "will have a code of ethics that applies to all of its executive officers, directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions."

92.     The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Business Conduct and Ethics (the "Code of Conduct") was not followed. In violation of the Code of Conduct, the Individual Defendants made numerous false and misleading statements as alleged herein, and failed to report violations of the Code of Conduct.

93.     The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's valuation was artificially

inflated due to the Misleading Sales Practices and the false and misleading statements concerning them.

94.     The 2020 Proxy Statement also stated the following, in relevant part, about the growth of Clover Health:

> We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.

> \*     \*     \*

> As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period.

> \*     \*     \*

> We've already seen a glimpse of what's possible. Clover currently offers Medicare Advantage plans in 7 states and 34 markets. Our "obvious" plans are among the most affordable in their markets. They generally offer the widest physician networks. As a result, they benefit from industry-leading organic growth, with a 38% annual growth rate compared to an 8% industry average.

95.     The 2020 Proxy Statement continued by touting the Clover Assistant:

> [T]he Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

- 33 -

96.     The 2020 Proxy Statement further touted the Company's purported "best-in-class"

healthcare plans, stating:

> The SCH board of directors believes that Clover provides a fundamentally different approach to insurance, offering highly affordable, best-in-class plans that combine wide access to healthcare and supplemental benefits with low out-of-pocket expenses. Clover designs its plans to provide the access of a PPO at lower than HMO costs. Most of its members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with wide network access and with the same in-and out-of-network costs for physician visits. For example, based on a company analysis that assumes a lifetime of seven years on Medicare, Clover estimates that its highest enrolled plan offers a 17% average lifetime cost savings compared to the highest enrolled MA competitor plan in Clover's five largest markets. Likewise, based on a similar company analysis, Clover estimates that its highest enrolled plan offers a 41% average lifetime cost savings compared to Original Medicare, taking into account the Kaiser Family Foundation's reported average Original Medicare enrollee's out-of-pocket spending on medical and long-term care services in 2016. The SCH board of directors believes that Clover's best-in-class plans will continue to deliver market-leading growth, allowing Clover Assistant to capture and synthesize more data and ultimately drive better care.

97.     The 2020 Proxy Statement described Clover's risk of litigation in the following

terms:

> From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector

- 34 -

General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

*    *    *

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "Risk factors—Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

*    *    *

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to

detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the

- 36 -

lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

98.     The 2020 Proxy Statement described the Company's "Sales and Marketing" as follows:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

99.     The 2020 Proxy Statement stated, of the Company's "risk adjustment model," that:

When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer-oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

100.     The 2020 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. The 2020

- 37 -

Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was engaged in the Misleading Sales Practices; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed a severe risk to the Company given the amount revenue of it received from Medicare; (3) a meaningful portion of Clover's and Clover Health's sales were attributable to unreported related party transactions; (4) Clover's subsidiary, Seek Insurance, misleadingly marketed to senior citizens; (5) the Clover Assistant software was faulty and unsophisticated; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### January 7, 2021 Press Release

101.    On January 7, 2021, the Company issued a press release announcing that the Merger had closed. Defendant Garipalli stated in the press release that "[a]s a public company, we will continue to pioneer a fundamentally different approach in the Medicare Advantage and Medicare space – investing in technology and partnering closely with physicians to help them make critical decisions for their patients at the point of care – with an overarching commitment to creating value for all stakeholders."

### January 13, 2021 SPO Registration Statement

102.    On January 13, 2021, the Company filed the SPO Registration Statement with the SEC in connection to the resale of 303,904,202 shares of Class A Clover common stock, 10,933,333 warrants to purchase shares of Class A Clover common stock, and 38,533,271 shares of Class A Clover common stock underlying warrants by "Selling Securityholders," including Defendants Garipalli, Palihapitiya, Wagner, Toy, Osborne, Reses, Ryans, and Turner. The SPO Registration Statement stated the following regarding the Company's business:

- 38 -

At Clover Health, *we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on* building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next-generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, *to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers*. We call our plans "Obvious" because *we believe they are highly affordable* – offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets – and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data-driven, personalized insights at the point of care through our software platform, we *believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale*, through an asset-light approach. Today, we have the highest membership growth rate among Medicare Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. *We believe our growth potential in existing and future markets is high*.

(Emphasis added.)

103. The SPO Registration Statement further promoted Clover Assistant and the supposed advantage that it provides, stating in relevant part:

*We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding*. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

\* \* \*

*As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to*

- 39 -

***members through our "Obvious" plans***. We strive to continuously lower our members' out-of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits…

(Emphasis added.)

104.    The SPO Registration Statement also touted Clover's "organic membership growth," and its recently added "infrastructure" which, along with a decrease in healthcare utilization, resulted in "improved results" for the Company, stating:

> ***As a result of our "Obvious" plans, we have achieved significant organic membership growth***. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. ***This expansion has largely been driven by our nation-leading established market take rate***, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period. Established market take rate is derived from publicly available CMS data and represents the number of members gained by an insurer as a percentage of the total number of incremental MA members added to comparable plans in established markets. This rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5 million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended September 30, 2019, in each case, representing a 46% increase. ***During 2018 and 2019, we also built the infrastructure to deliver on a more efficient healthcare experience for our members***, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1)% and (38.3)%, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2)%. ***Our improved results in the current year were the***

- 40 -

*result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19*.

(Emphasis added.)

105.    The SPO Registration Statement also emphasized the following aspects of the

Company's business model:

At Clover Health, we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next-generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers. We call our plans "Obvious" because we believe they are highly affordable—offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets—and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data-driven, personalized insights at the point of care through our software platform, we believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale, through an asset-light approach. Today, we have the highest membership growth rate among Medicare Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. We believe our growth potential in existing and future markets is high.

\*        \*        \*

We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as

- 41 -

athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

*    *    *

As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to members through our "Obvious" plans. We strive to continuously lower our members' out-of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits. . . .

106. The SPO Registration Statement stated the following about the Company's growth, in pertinent part:

We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.

*    *    *

As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period. Established market take rate is derived from publicly available CMS data and represents the number of members gained by an insurer as a percentage of the total number of incremental MA members added to comparable plans in established markets. This rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5 million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended

- 42 -

September 30, 2019, in each case, representing a 46% increase. During 2018 and 2019, we also built the infrastructure to deliver on a more efficient healthcare experience for our members, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1)% and (38.3)%, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2)%. Our improved results in the current year were the result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19.

107.    The SPO Registration Statement further promoted physician usage of the Clover Assistant, stating that:

The Clover Assistant delights and engages physicians. We are focused on empowering and delighting physicians that use our platform. Physicians are highly satisfied with the Clover Assistant platform, as evidenced by our platform's positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic and NextGen. Onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

108.    With regard to, "Government Regulation," the SPO Registration Statement maintained that "[w]e work diligently to ensure compliance with all applicable laws and regulations." The SPO Registration Statement continued:

[The Company's] operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.

109.    Concerning any "Legal Proceedings," the SPO Registration Statement stated that the Company was "not presently involved in any legal proceeding the outcome of which, we

- 43 -

believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

110.    The SPO Registration Statement elaborated on Clover's risk of litigation as follows:

> From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV"), audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

> *    *    *

> There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and

- 44 -

the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

*  *  *

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-

- 45 -

Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

111. The SPO Registration Statement stated the following of the Company's "Sales and Marketing:"

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

- 46 -

112.     The SPO Registration Statement also stated the following concerning the Company's "risk adjustment model:"

> When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer-oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

### *January 27, 2021 Form 8-K and Conference*

113.     On January 27, 2021, the Company filed a current report with the SEC on Form 8-K. The current report attached as an exhibit a Company presentation titled "Insurance & Retail: Healthcare's Odd Couple," stating that Clover had "prepared [the] slides for use in connection with its presentation at an industry conference on January 27, 2021." The slides highlighted that "Clover lowers barriers to care" by capping costs of care and utilizing "broad and open networks." Moreover, the slides asserted that "Clover Assistant gives providers a holistic view of a patient's health."

114.     The statements and omissions referenced in ¶¶ 64–88 and 101–113 herein were materially false and misleading and failed to disclose material facts necessary to make the

- 47 -

statements made not false and misleading. The Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was engaged in the Misleading Sales Practices; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed a severe risk to the Company given the amount revenue of it received from Medicare; (3) a meaningful portion of Clover's and Clover Health's sales were attributable to unreported related party transactions; (4) Clover's subsidiary, Seek Insurance, misleadingly marketed to senior citizens; (5) the Clover Assistant software was faulty and unsophisticated; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

115.    On February 4, 2021, *Hindenburg Research* published the Hindenburg Report, titled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation." The Hindenburg Report described a four-month investigation of the Company consisting of "more than a dozen interviews with former employees, competitors, and industry experts, dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials[.]" As a result of their investigation, *Hindenburg Research* revealed that "Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month."

116.    The Hindenburg Report revealed that "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation

- 48 -

by the Department of Justice (DOJ), which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained" and that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor." The Hindenburg Report further opined that, "the [DOJ] investigation has merit."

117. According to the partly redacted Civil Investigative Demand issued by the DOJ to Clover, the DOJ had commenced a "False Claims Act investigation" regarding "whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal agencies." Further revealed in the Civil Investigative Demand is that the DOJ requested information from Clover and Clover Health[33] in connection to, *inter alia*: (i) Clover's and Clover Health's payments to healthcare providers to get them to steer patients towards Clover's Medicare Advantage plans; (ii) Clover's and Clover Health's activities to get providers to refuse patients with non-Clover and non-Clover Health coverage; (iii) Clover's and Clover Health's payments to providers' staff to induce them into conveying information relating to Clover and Clover Health plans to patients; (iv) Clover's and Clover Health's payments related to Clover Assistant; (v) Clover's and Clover Health's patient recruitment efforts; (vi) the Clover's and Clover Health's activities relating to matching patients with Medicare Advantage plans; and (vii) the "Seek Medicare" online platform run by the Company's subsidiary Seek Insurance.

118. The Hindenburg Report additionally stated:

---

[33] The Civil Investigative Demand defines "Clover" to mean "Clover Health Investment Corporation, Clover Health LLC, Clover Health Corp., Clover Insurance Company, and Clover health Holdings, Inc., including their affiliates, subsidiaries, predecessors, and successors."

- 49 -

Clover claims that its best-in-class technology fuels its sales growth. We found that much of Clover's sales are driven by a major undisclosed related party deal and misleading marketing targeting the elderly. These practices should not come as a surprise, given that in 2016, Clover was fined for misleading marketing practices by the Centers for Medicare & Medicaid Services (CMS). The fine was issued after Clover's repeated failure to amend misleading statements about its plan offerings. A former employee told us the fine was so small it just emboldened Clover to push the envelope further.

119.    The Hindenburg Report revealed that Seek Insurance, the Company's "thinly-disclosed subsidiary" makes "no mention of its relationship with Clover on its website yet misleadingly advertises to seniors that it offers 'independent' and 'unbiased' advice on selecting Medicare plans." The Hindenburg Report described how Seek Insurance claims, "'We don't work for insurance companies. We work for you', [sic] despite literally being owned by Clover, an insurance company." The Hindenburg Report continued by noting that Seek Insurance's activities are also "under investigation by the DOJ."

120.    The Hindenburg Report also revealed that numerous former Clover Health employees explained that, "much of Clover's sales are (and Clover Health's sales were) fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez." One former employee interviewed by *Hindenburg Research* estimated that "Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming from the undisclosed relationship." Another former employee that *Hindenburg Research* interviewed stated that "Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name 'for compliance purposes'. Insurance filings confirm this. The Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement."

- 50 -

121.    A former Clover Health employee explained that "the DOJ is specifically asking about upcoding, or the practice of overbilling Medicare." The Hindenburg Report stated that "[m]ultiple former employees explained that Clover's software is primarily a tool to help the company increase coding reimbursement."

122.    The Hindenburg Report further maintained that "according to doctors and former employees we interviewed, [physicians] use [Clover's software] because Clover pays them extra to use it. Physicians are paid $200 per visit to use the software, twice the normal reimbursement rate for a Medicare visit." *Hindenburg Research*'s investigation revealed that "[d]octors at key Clover providers described the software as 'embarrassingly rudimentary', 'a waste of my time' and as just another administrative hassle to deal with."

123.    Following this revelation, the Company's share price fell $1.72, or about 12.3%, from its closing price of $13.95 per share on February 3, 2021, to close February 4, 2021 at $12.23 per share. The Company's warrant price fell $0.18, or about 5%, from its closing price of $3.57 per warrant on February 3, 2021, to close February 4, 2021 at $3.39 per warrant.

124.    The next day, February 5, 2021, before market open, Clover announced that the SEC was also investigating and that it had requested document and data preservation for the period from January 1, 2020 to the present, concerning the Misleading Sales Practices and other issues described in the Hindenburg Report.

125.    Following this announcement, the Company's share price fell $0.53, or about 4.3%, in intraday trading on February 5, 2021. The Company's warrant price fell $0.28 per warrant, or about 8.2%, in intraday trading on February 5, 2021.

## DAMAGES TO CLOVER

126. As a direct and proximate result of the Individual Defendants' misconduct, Clover will lose and expend many millions of dollars.

127. Such expenditures include, but are not limited to, costs associated with the costs of legal fees associated with the Securities Class Actions and other lawsuits filed against the Company, its CEO, CFO, President and CTO, SCH's former CEO and Company advisor, SCH's former CFO, SCH's former President, and two former SCH directors and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128. Such expenditures include, but are not limited to, costs associated with the costs of defending lawsuits arising out of and/or investigations of the Misleading Sales Practices, including investigations conducted by the DOJ and SEC, and for fines paid in connection thereto.

129. Such expenditures include, but are not limited to, costs arising out of the Misleading Sales Practices, including but not limited to payments made to healthcare providers and related parties.

130. Additionally, these expenditures include, but are not limited to, excessive and unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

131. As a direct and proximate result of the Individual Defendants' conduct, Clover has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will impact the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

- 52 -

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

132.    Plaintiff brings this action derivatively and for the benefit of Clover to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Clover, certain of the SCH Defendants' violations of Section 14 (a) of the Exchange Act, and against the Clover Health Defendants for their aiding and abetting the SCH Defendants' breaches of fiduciary duty.

133.    Clover is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.    Plaintiff is, and has been at all relevant times, a Clover shareholder. Plaintiff will adequately and fairly represent the interests of Clover in enforcing and prosecuting its rights, and, to that end, has retained competent, experienced counsel to enforce and prosecute this action.

135.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

136.    A pre-suit demand on the Board of Clover is futile and, thus, excused. At the time this action was filed, the Board consists of the following seven individuals: Defendants Garipalli, Toy, Turner, and Shapiro (the "Director-Defendants") along with non-parties Clinton, William G. Robinson, Jr., and Demetrios L. Kouzoukas (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who were on the Board at the time this action was commenced.

137.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they knowingly or recklessly engaged in to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially

- 53 -

investigate the allegations and to decide whether to pursue action against themselves and the other perpetrators.

138.    Demand is further excused as to all of the Director-Defendants because the Misleading Sales Practices were an unlawful business strategy that the Company and Clover Health engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company and Clover Health, the Board made and/or allowed the Company and Clover Health to engage in the schemes as described above.

139.    In total breach of their fiduciary duties, the Director-Defendants, knowingly or recklessly, participated in the alleged misconduct including, *inter alia*, by breaching their own fiduciary duties to the Company and aiding and abetting the SCH Defendants' breaches of their fiduciary duties to the Company. The fraudulent scheme was intended to make the Company appear more attractive to investors. As a result, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile and excused.

140.    Demand is also excused as to the Director-Defendants because, by the terms of the 2020 Proxy Statement, Company shareholders were asked to approve the Director-Defendants' compensation by way of the 2020 Equity Incentive Proposal, which reserved shares of the Company's common stock for their own benefit, as well as the 2020 Management Incentive Plan Proposal, which reserved shares of the Company's common stock for the benefit of Defendants Garipalli and Toy. These lucrative financial incentives precluded the Director-Defendants from acting in the best interests of shareholders, as they have failed to correct the false and misleading statements and omissions contained in the 2020 Proxy Statement. The Director-Defendants

- 54 -

materially benefited from the false and misleading statements included in the 2020 Proxy Statement, solicited in their behalf, since, *inter alia*, it resulted in their election as Company directors, shareholder approval of the 2020 Equity Incentive Proposal, and shareholder approval the 2020 Management Incentive Plan Proposal. The Director-Defendants are thus conflicted from independently and disinterestedly considering a demand against themselves based on these circumstances.

141. Demand is also excused as to the Defendants Garipalli, Toy, and Turner because they were fully aware of the Misleading Sales Practices during the Relevant Period. Despite this awareness, the Director-Defendants caused the Company and Clover Health to disseminate the false and misleading statements at issue. Therefore, Defendants Garipalli, Toy, and Turner face a substantial likelihood of liability and demand is futile as to them.

142. Demand is futile on Defendant Garipalli for the following, additional reasons. Defendant Garipalli is Clover Health's cofounder and has been Clover's CEO and a Company director since the January 2021 Merger. He is also a member of the Audit Committee. Previously, Defendant Garipalli served as Clover Health's President from July 2014 until March 2019. Therefore, as the Company admits, he is a non-independent director. The Company provides Defendant Garipalli with his principal occupation for which he is entitled to substantial compensation. As the Company provides Defendant Garipalli with his principal occupation and means of livelihood, he cannot independently and disinterestedly consider a demand against the other current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Clover. Defendant Garipalli was responsible for many of the false and misleading statements and omissions that were made,

- 55 -

including those contained in the Company's SEC filings referenced herein. As the Company's highest officer and as a trusted Company director, he conducted little oversight of the Misleading Sales Practices (which Defendant Garipalli engaged in and permitted despite his awareness of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Garipalli is a defendant in the Securities Class Actions. Therefore, Defendant Garipalli breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

143.    Demand on Defendant Toy is futile for the following, additional reasons. Defendant Toy has been Clover's President and CTO, and a Company director, since the January 2021 Merger. Previously, he held the same positions with Clover Health from March 2019, February 2018, and November 2018, respectively, until the Merger. Therefore, as the Company admits, he is a non-independent director. Defendant Toy has received and continues to receive significant compensation for his role as a director as described above. As a Company director, he conducted little oversight of the Misleading Sales Practices (which Defendant Toy engaged in and permitted despite his awareness of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Toy is a defendant in two of the Securities Class Actions. Therefore, Defendant Toy breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

144. Demand is futile on Defendant Turner for the following additional reasons. Defendant Turner has been a Company director since the January 2021 Merger. He is also a member of both the Audit Committee and the Talent and Compensation Committee. Previously, he was a Clover Health director from April 2015 until the Merger. Defendant Turner has received and continues to receive significant compensation for his role as a director as described above. As a Company director he conducted little oversight of the Misleading Sales Practices (which Defendant Turner engaged in and permitted despite his awareness of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Therefore, Defendant Turner breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

145. Demand is futile on Defendant Shapiro for the following, additional reasons. Defendant Shapiro has been a Company director since the January 2021 Merger. He is also the Chair of the Audit Committee and the Chair of the Nominating and Corporate Governance Committee. As a Company director he conducted little oversight of the Misleading Sales Practices, the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Therefore, Defendant Shapiro breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

146. Demand is futile on the Board for the following, additional reasons.

- 57 -

147.    Demand in this case is excused because the Director-Defendants—all of whom are named as defendants in this action, one of whom is a defendant in each of the Securities Class Actions, and one of whom is a defendant in two of the Securities Class Actions—control the Company and are beholden to one another. The Director-Defendants have longstanding relationships with each other and the other Individual Defendants which preclude them from acting independently and in the best interests of the Company and its shareholders. These conflicts of interest precluded the Director-Defendants from effectively monitoring the Company's operations and internal controls and calling into question the Individual Defendants' misconduct. Therefore, any demand on the Director-Defendants would be futile and is excused.

148.    Defendants Garipalli, Turner, and Shapiro (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. According to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, *inter alia*, the quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to uphold these responsibilities, as evidenced by the Company filing false and misleading financial statements with the SEC and failing to maintain internal controls. Therefore, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

149.    Clover has been, and will continue to be, exposed to significant losses due to the misconduct alleged herein, but despite these losses the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for the misconduct in an attempt to

- 58 -

recover for Clover any part of the damages the Company has suffered and will continue to suffer thereby. Therefore, any demand on the Director-Defendants would be futile.

150. The Individual Defendants' misconduct as described above could not have been the product of legitimate business judgment because it was based on bad faith and intentional, reckless, or disloyal misconduct. Therefore, none of the Director-Defendants can claim exculpation from their violations pursuant to the Company's charter (to the extent such a provision exists). As each of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company. Therefore, demand is excused as being futile.

151. The acts complained of herein constitute violations of fiduciary duties owed by Clover's officers and directors; these acts are incapable of ratification.

152. The Director-Defendants may be protected against personal liability for their breaches of fiduciary duty by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, sometimes referred to as the "insured-versus-insured exclusion." Thus, if the Director-Defendants were to sue themselves or certain of the officers of Clover, there would be no directors' and officers' insurance protection for them. Therefore, the Director-Defendants cannot be expected to bring such a suit. However, if the suit is brought derivatively, as this action is, such insurance coverage, if it exists,

- 59 -

will provide a basis for the Company to effect a recovery. Therefore, demand on the Director-Defendants is futile and excused.

153. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Clover to sue the Individual Defendants, because, if they did, they would face large uninsured individual liabilities. Therefore, demand is futile in that event as well.

154. For the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Therefore, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Defendants Palihapitiya, Osborne, Reses, and Ryans for Violations of Section 14(a) of the Exchange Act**

155. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

157. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

- 60 -

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

158. Under the direction and watch of Defendants Palihapitiya, Osborne, Reses, and Ryans, the 2020 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was engaged in the Misleading Sales Practices; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed a severe risk to the Company given the amount revenue of it received from Medicare; (3) a meaningful portion of Clover's and Clover Health's sales were attributable to unreported related party transactions; (4) Clover's subsidiary, Seek Insurance, misleadingly marketed to senior citizens; (5) the Clover Assistant software was faulty and unsophisticated; and (6) the Company failed to maintain internal controls As a result, the Company's public statements were materially false and misleading at all relevant times.

159. Defendants Palihapitiya, Osborne, Reses, and Ryans also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that therein the Company purported to employ performance based compensation elements but failed disclose that the Company's revenues and profits, and resultantly its financial performance, were based on the Misleading Sales Practices and further misrepresented as a result of false and misleading statements, causing the Company's share price and financial performance to be artificially inflated and allowing Defendants Palihapitiya, Osborne, Reses, and Ryans to wrongfully benefit from the misconduct alleged herein.

160. Moreover, the 2020 Proxy Statement was false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to Defendants Palihapitiya, Osborne, Reses, and Ryans' failures to abide by the Code

- 61 -

of Conduct and their engagement in, or tolerance of, the Misleading Sales Practices and the scheme to issue false and misleading statements and omissions of material fact.

161.     Defendants Palihapitiya, Osborne, Reses, and Ryans also caused the 2020 Proxy Statement to be false and misleading concerning the Board's risk oversight, which was inadequate given the Misleading Sales Practices.

162.     In the exercise of reasonable care, Defendants Palihapitiya, Osborne, Reses, and Ryans should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors and the approval the Proposals.

163.     The misrepresentations and omissions set forth herein were material to shareholders in voting on the Proposals who would not have approved, *inter alia*, the 2020 Equity Incentive Plan and the 2020 Management Incentive Plan, had they been informed about the Misleading Sales Practices.

164.     The false and misleading elements of the 2020 Proxy Statement led to the approval of the Proposals and the election of the Directors, allowing them to breach their fiduciary duties to Clover.

165.     The Company was damaged as a result of the Defendants Palihapitiya, Osborne, Reses, and Ryans' material misrepresentations and omissions in the 2020 Proxy Statement.

166.     Plaintiff, on behalf of Clover, has no adequate remedy at law.

## **SECOND CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

167.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Clover's business and affairs.

169.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

170.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Clover.

171.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

172.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Misleading Sales Practices.

173.    Also in breach of their fiduciary duties owed to Clover, the Individual Defendants willfully or recklessly made, and/or caused the Company to make, false and misleading statements and omissions of material fact to the investing public which failed to disclose, *inter alia*, that: (1) the Company was engaged in the Misleading Sales Practices; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed a severe risk to the Company given the amount revenue of it received from Medicare; (3) a meaningful portion of Clover's and Clover Health's sales were attributable to unreported related party transactions; (4) Clover's subsidiary, Seek

- 63 -

Insurance, misleadingly marketed to senior citizens; (5) the Clover Assistant software was faulty and unsophisticated; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

174. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

175. The Individual Defendants also breached their fiduciary duty to the Company by causing the Company to pay the Individual Defendants their annual bonuses and/or stock awards each year that they violated the Company's policies.

176. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Clover's securities.

177. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

- 64 -

knowingly or recklessly and for the purpose and effect of artificially inflating the price of Clover's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

178.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Clover has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.    Plaintiff on behalf of Clover has no adequate remedy at law.

## THIRD CLAIM

### Against the Clover Health Defendants for Aiding and Abetting
### Breach of Fiduciary Duty

181.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.    The Clover Health Defendants aided and abetted the SCH Defendants who breached their fiduciary duty to Clover.

183.    The Clover Health Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

184.    Specifically, the Clover Health Defendants engaged in the Misleading Sales Practices and promoted the Merger by issuing false and misleading statements concerning Clover's operations and business prospects, the status of regulatory and legal proceedings against Clover Health, and the Clover Assistant. Moreover, the Clover Health Defendants controlled and operated Clover Health, Clover's functional and operational predecessor, and caused Clover Health to

- 65 -

jointly issue press releases and file SEC filings which contained materially false and misleading statements promoting Clover's future operations and prospects.

185. The Clover Health Defendants are jointly and severally liable to the same extent as the SCH Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

186. As a direct and proximate result of the Clover Health Defendants' aiding and abetting of the SCH Defendants' breaches of duty alleged herein, Clover has sustained and will continue to sustain substantial damages.

187. Plaintiff on behalf of Clover has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Clover, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Clover;

(c) Determining and awarding to Clover the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Clover and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Clover and its shareholders from a repeat of the damaging events described

- 66 -

herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Clover to nominate at least three candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Clover restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 21, 2021

Respectfully submitted,

Wade B. Cowan (SC#9403)
P.O. Box 50617
Nashville, Tennessee 37205
Telephone: 352-2331
Email: wcowan@dhhrplc.com

*Attorney for Plaintiff*

- 67 -

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3287
Email: pkim@rosenlegal.com

## **VERIFICATION**

I, Manteg Luthra am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 4/15/2021_____, 2021.

_____
Manteg Luthra